ESTELLA OSBORN, Respondent, v. THE WABASH RAILROAD COMPANY, Appellant.

Kansas City Court of Appeals, May 4, 1914.

1. NEGLIGENCE: Railroad Crossing: Duty to Look Both Ways and Listen. A railroad crossing is a dangerous place and is itself a signal of danger. A traveller approaching it is, therefore, imperatively required by law to look carefully in both directions, at a convenient distance from the crossing and where the look will be effective, before venturing upon it, if, by looking, a train can be seen. And the duty to look is a continuing one until the crossing is reached. Not only is he required to look but also to listen. He must not venture blindly on the track without first using his senses of sight and

Osborn v. Railroad.

hearing, and if, for any reason, his sight is obstructed that is all the more reason for a greater exercise of his sense of hearing.

2. ———: ———: ———: **Contributory Negligence.** While the statute, Sec. 3140, R. S. Mo. 1909, requires the bell to be rung 80 rods from the crossing and to be kept ringing until the crossing is passed, or the whistle to be sounded at said distance and to be sounded at intervals until the crossing is reached, and renders the railroad liable in damages for a failure to do so, yet the statute also provides that this will not preclude a showing that such failure was not the cause of the injury, and the rule of contributory negligence is not abrogated. So that even if the statutory signals are not given, if a person by exercising ordinary care could have avoided injury and fails to do so, he cannot recover, since he is guilty of contributory negligence.

3. ———: ———: ———: ———: **Right to Presume Signals Will be Given.** It is only where the person about to cross a railroad is paying attention, and can neither see nor hear anything indicating that a train is coming, that he can assume, without negligence, that, if one were coming, the signals would be given. But where a person can see and hear, or can do either, he cannot rely blindly upon any presumption that the signals will be given. He can neither close his eyes nor his ears, but must use the means of self protection given him.

4. ———: ———: ———: ———: **Unusual Conditions: Foggy Weather: Presumption of Care on Part of Deceased.** Deceased was approaching a railroad crossing in an enclosed two wheeled cart travelling at the rate of four miles per hour. He had on a cap with the ear flaps partially pulled down. A glass window in front and one on each side enabled him to see in front and to the right and left. On a clear day for at least 100 feet before reaching the crossing he could see down the track for a quarter of a mile or further. No one saw the collision, and it is not known what deceased did in the way of looking and listening. There was no wind blowing. A fog prevailed to a varying extent, sometimes heavier, then lighter, and then settling again. It lay in strata, heavier at some periods of the day and in some places than at other periods and in other places. There was nothing to prevent deceased from hearing the train. It consisted of an engine and caboose with 23 cars loaded with coal, comprising a train of 1100 tons going 35 miles an hour, and ran over a trestle the north end of which was 240 feet of the crossing. All witnesses, who were where they could hear the train, heard it easily and distinctly at distances varying from a quarter to three quarters of a mile away and that within a few moments before the crossing was

Osborn v. Railroad.

reached. No difficulty was had in locating the place and direction from whence the sound came and the character of the train. Of the witnesses who testified concerning the ability to see the train on account of the fog, two of them were plaintiff's witnesses, both of whom saw it a quarter of a mile away notwithstanding the fog, one of these saw it as it passed over the trestle. The third was not at a place where he could have seen the train but gave his opinion that it could not have been seen more than 50 yards away. Defendant had two witnesses who saw and heard it a quarter of a mile away, one of them just before it reached the crossing and looking along the same line deceased would have to look to see it. *Held*, that under these circumstances and this evidence the presumption cannot be indulged that deceased was in the exercise of ordinary care. For what all the witnesses, located more unfavorably than was deceased, heard, he could have heard had he been in the exercise of due care. Where the positive and uncontradicted facts show that if deceased had taken those precautions which the law required of him to both look and listen, he would have been aware of the approach of the train, the presumption of due care cannot stand.

5. ——: ——: ——: ——: ——: ——: ——: ——. If, however, the fog obscured his view, this did not relieve deceased of negligence but rather served to increase the degree of care required of him to listen and otherwise satisfy himself that no train was approaching. Unusual conditions demand extra precautions. Ordinary care under normal conditions is not ordinary care under unusual conditions produced by dust, fog, snow and the like. Deceased's sight and hearing were both good. The train, according to all the evidence was making a great noise. If deceased had listened he could have heard what others heard, and in the presence of the undisputed fact that all others did hear there is no room for the presumption that deceased listened but did not hear and should be relieved from negligence because he failed to hear.

6. **EVIDENCE: Conflict: Opinion of Witness.** Where credible witnesses, having opportunity for observation, testify that a fact exists, no conflict arises from the expression of an opinion to the contrary by another witness when it affirmatively appears that his situation was not such as that he could have observed and formed an opinion concerning the fact about which he attempts to express an opinion.

7. ——: ——: ——. A witness who has sufficient knowledge of the facts and is so situated as to be able to form an opinion, may give that opinion as to the distance an object could be seen, but such evidence is of a weak character as compared to positive testimony on the subject and where the

witness is shown not to have been present at the time and place in question so as to have been able to form an opinion on the matter, it will not have sufficient probative force to create a conflict with such other positive testimony. While a witness may testify that certain things could or could not have been seen from one point to another, it must be shown that he was in a position to form an opinion and did form it, and that his statement is something more than a mere guess.

Appeal from Gentry Circuit Court.—*Hon. Wm. C. Ellison,* Judge.

REVERSED.

*J. L. Minnis, N. S. Brown* and *J. W. Perry* for appellant.

*D. D. Reeves* and *Kendall B. Randolph* for respondent.

TRIMBLE, J.—Shortly before one o'clock in the afternoon of January 20, 1911, plaintiff's husband, Ira B. Osborn, was struck and killed at a public crossing by one of defendant's freight trains. This suit is to recover damages for his death upon the ground that it was caused by the negligent failure of those in charge of the train to give the statutory crossing signals. The answer, in addition to a general denial, pleaded contributory negligence. A trial was had resulting in a verdict for plaintiff in the sum of $3000. Defendant appealed, and the sole question presented is whether defendant's demurrer to the evidence should have been sustained. To state it more specifically, the controversy is over the element of contributory negligence charged to have been shown on the part of deceased, that is, upon the question whether the evidence discloses that, in going upon the track under the circumstances, he was, as a matter of law, lacking in that care and caution which ordinarily prudent persons would ordinarily use in the same situation and circumstances.

The case presents no phase of the humanitarian doctrine. It is based solely on the failure to give the statutory signals, and there is no doubt but that the evidence, upon all features, aside from contributory negligence, presented a case for the determination of the jury.

In order that this question of deceased's contributory negligence may be understood and properly disposed of, it is necessary to state with some particularity the surroundings at the scene of, and the circumstances attendant upon, the killing.

The crossing in question was upon a public road running due east and west. The railroad runs from the southeast to the northwest, and the track is straight for some distance on each side of the crossing. The deceased was a rural mail carrier and was familiar with the crossing. He was travelling east along the county road, driving two ponies hitched to a two-wheeled cart which he used in delivering the mail. The seat was enclosed, but there was a window in front and one on each side of the box through which he could easily see. The seat was low and, when seated in the vehicle, deceased's head was about on the same level it would have been had he been walking along the road. He was a young man, in good health, with full possession of his faculties of sight and hearing, and wore a cap with ear muffs which came down partially over his ears.

The crossing was three-quarters of a mile southeast of the station of Whitton. There was no station or station agent at this place—only a platform and siding. A regular eastbound passenger train usually passed Whitton at 12:30, but on the day in question it had orders not to pass Whitton before 12:50. And this twenty minutes was given to an extra westbound freight train to run from McFall northwest to Whitton and get on the siding there in time to allow the passenger to pass. If at the hour of 12:50 the freight had

not arrived, or the passenger train had not been flagged, the latter had a right to proceed. So that when deceased approached the crossing in question at 12:40 it was a little past the usual time for the passenger train to go southeast at that point, and it had not yet reached Whitton. The extra freight, however, was approaching the crossing, going northwest, and running at thirty-five miles an hour in order to reach Whitton and get in the clear before the passenger train's time of 12:50 was up. The pilot of the engine struck the team and cart on the crossing in such a way that both of the horses were thrown on the east side of the track, one of them being killed and falling on the north side of the road, the other being knocked down. The wagon was smashed and scattered along the track, and deceased's body was carried on the pilot a short distance, perhaps 200 feet up the track, and then thrown to the east side thereof. His cap was found on the pilot with the ear laps slightly down, and he was dead when reached.

Although the evidence is conflicting as to whether the train whistled for the crossing, yet, as there was substantial evidence tending to show that it did not, and the jury found for plaintiff, we must, for the purposes of the question now before us, assume that neither the bell was rung nor the whistle blown as it approached the crossing. The only audible warning of its approach, therefore, given by the train, was merely that which accompanies a heavily loaded freight train consisting of an engine with twenty-three cars and a caboose—the load being something over eleven hundred tons. The track was slightly down grade for a short distance next to the crossing, and then at the crossing it changed to upgrade.

The county road passed over the top of a hill about 700 feet west of the crossing and then came on down the hillside to a slightly low place at the foot of the hill about 400 feet west of the crossing and thence con-

tinued east on a slight up grade to the crossing. From the top of the hill, and from any point along the greater portion of the hillside, as one came down toward the crossing from the west, the railroad to the southeast could be distinctly seen for at least a half mile on a clear day. There is a conflict in the evidence as to whether the railroad could be seen from the low place in the road at the bottom of the hill, the defendant's evidence tending to show that even at that point, 400 feet from the crossing, and from thence to the crossing, the railroad to the southeast could be seen for a quarter of a mile or more. Plaintiff had evidence tending to show that the railroad could not be seen at this low place nor at certain points thereafter along the road. But, aside from this conflict, the evidence all shows that on a clear day, for at least 100 feet before the crossing was reached, the railroad could be seen without any difficulty for more than a quarter of a mile to the southeast.

The day in question was cloudy and misty, and a fog prevailed to a greater or less extent throughout the day. Sometimes it would lift or clear for awhile and then would settle again. The fog appeared to lie in different strata some of which were denser than others, and the degree of obscurity was greater at some periods of the day and in some places than at other periods and in other places. The part the fog had, or may have played, in preventing deceased from *seeing* or *hearing* the train may be more correctly presented by a careful analysis of the evidence of the witnesses on this point.

P. M. Ward, witness for plaintiff, who lived three-quarters of a mile southeast of the crossing and who was in his lot feeding his cattle, *heard* the train coming when it was half a mile away and *saw* it when it came around a bend a quarter of a mile away, and saw it was a freight train.

Wade Henderson, another witness for plaintiff, a young man, lived a quarter west and a little south of the crossing, about diagonally across a forty acres southwest from the crossing. He and his father were in the house with the doors and windows closed. Their clock had stopped and, knowing the usual time for the passenger train to go by, they desired to set it in accordance therewith. Both heard the freight train, and the father told the son to look out and see if it was the passenger. The son went to the door and saw the train on the trestle a little over a quarter of a mile away and recognized it as a freight train. The north end of this trestle was not quite a hundred yards from the crossing. So that both father and son, inside the house and with the doors and windows closed, heard the train, and the son saw it a quarter of a mile away on the trestle the north end of which was within 300 feet of the crossing where the collision took place. This witness said it was foggy but that he had no difficulty in seeing that it was a freight train and could hear the roar and rumble of the train very distinctly.

Mrs. Spires, another witness for plaintiff, living about three-quarters of a mile south of the crossing and something like thirty-five yards from the railroad track was in her house with the doors and windows closed, engaged in churning. She heard the train as it passed and thought at first it was the passenger but concluded it made too much noise for that and looking out saw it was the freight.

Two other witnesses for plaintiff, Mrs. Finderburg and her husband, testified to hearing the train, the former while in her house about forty yards from the railroad and the other about a half mile therefrom, but, as they were two and four miles respectively from the crossing, their testimony would not throw light on the noise the train made at that point or on the distance it could be seen there. So that of all of plaintiff's witnesses who testified, none swore to facts showing that

the train could not be *heard* and its direction ascertained, on account of the fog. And none of them testified to any facts showing the train could not have been *seen* for at least a quarter of a mile on account of the fog, unless it be the witness, Woodson Swope, whose testimony we will now consider.

This witness was at Whitton, three-quarters of a mile northwest of the crossing, when the accident happened. He was expecting the passenger train from the northwest. But he heard the freight running as it approached Whitton when it was a quarter of a mile away, and knew from the sound and direction thereof that it was not the passenger. His testimony, therefore, showed no difficulty for the train to be *heard* on account of the fog. And as to the difficulty of its being *seen* on that account, he testified as follows: "Q. What kind of a day was it as to fog? A. Why, it was a very foggy day. Q. To what extent was the view obscured? A. Well, I don't suppose you could have seen anything very far. I don't suppose you could have seen a train over fifty yards, very much; I wouldn't judge that you could."

In view of the fact that he was three-quarters of a mile distant from the crossing, that the fog was more dense at times than at others, that it came and went, and varied greatly not only at times but also at places not far apart, and that the form of the answers discloses that he was not attempting to do anything more than to give expression to a mere opinion, can it be said that this evidence constitutes any substantial basis on which to determine how far the train could have been seen at the crossing, the moment of the accident? Especially when plaintiff's other witnesses show that when the train was on the trestle approaching the crossing not much over 100 yards from it and a very few seconds before the accident, it could be both seen and heard for a quarter of a mile? Added to this is the

evidence of the following witnesses who testified for defendant:

W A. Henderson, father of the young man who testified as above stated. He was in his house with the doors and windows closed slightly over a quarter southwest of the crossing. He and his son heard the train on the trestle and his son looked out, saw it a quarter of a mile away and, though there was some fog, yet he recognized it as a freight train and so reported to his father. After eating his dinner, the father went to the barn and saw the passenger train standing at the crossing something over a quarter of a mile distant. However, the atmosphere was clearer at this moment.

George Low lived a half mile west of the crossing. He was cleaning the snow and ice off his porch and heard the train coming when it was three quarters of a mile away and recognized from the noise it was making that it was a freight train. At this time it was a quarter or little over a quarter of a mile distant from and had not reached the crossing.

Owsley Brown lived a half mile east and ten or twelve rods north of the crossing. He was in his yard at the time of the collision and heard the train when it was a half mile south of the crossing and only a minute before deceased was killed. The train, at that moment, was three-quarters of a mile from the witness, and his attention was attracted to the noise and rumble of the train passing over the trestle.

Bert Lumry was on the railroad west of the crossing and walked southeast down the railroad toward the crossing for about a quarter of a mile and left it at a point half a quarter north of the crossing a moment before the collision, going west to a well to water some stock. While on the railroad he looked ahead of him past the crossing and both saw and heard the freight train coming toward him. The train at that time was three-quarters of a mile from him, and his vision was along the same line of that of anyone who

would be approaching the crossing at that time and looking for the train. He had left the railroad, however, and had started west to a well in the field when the train reached the crossing.

Alvin Whitton was in the store at Whitton but was expecting to take the passenger train when it came by. He heard the train when he was in the store and thought it was then about three-quarters of a mile down the track. This would put it right at the crossing and may have been the stock alarm blown a moment before deceased was struck. But when he went outside he saw it fully half a quarter away and recognized it as a freight train just slowing up. He stayed outside only about three minutes, long enough to see it was a freight and then went back inside.

It is true the five foregoing witnesses testified for defendant, and while, in considering whether or not a case was made for the jury, plaintiff's evidence must be accepted as true and it must be given the benefit of every inference which can be rightfully drawn therefrom, yet it must also be remembered that where plaintiff's evidence does not contradict that of defendant's and plaintiff's case rests upon an inference "scarcely more than conjecture, or the possibility that the fact might exist, then the court ought to look at the character of the evidence on the other side." [Furber v. Bolt & Nut Co., 185 Mo. l. c. 311; Link v. Hathway, 143 Mo. App. l. c. 509.]

No witness saw deceased approach the track, and no one testified as to what he did with reference to looking or listening. The engineer was on the right-hand side of his engine, and the boiler and cab shut off his view to the west of the crossing. The first he saw was the horses coming up over the pilot on the east side the instant of the collision. The fireman was shovelling coal at the time. The conductor and head brakeman were also in the cab, but the conductor was in the engineer's seat and had no better view than the engi-

neer. The head brakeman was not called as a witness by either side. He was, at the time of the trial, in Colorado for lung trouble.

The foregoing is a fair statement and resume of all the circumstances under which deceased was struck and killed. What is the law governing the situation applicable to the deceased and the defendant at that time?

Deceased was approaching a railroad crossing in an enclosed two-wheeled cart at the rate of four miles an hour. For a distance of at least 100 feet before he reached the crossing he could, on a clear day, see down the track for a quarter of a mile or further. (The effect of the fog will be discussed later.) As a railroad crossing is a dangerous place the law imperatively required deceased to look careully in both directions, at a convenient distance from the crossing and where the look will be effective, before venturing upon it, if, by looking, a train could be seen. And the duty to look is a continuing one until the crossing is reached. [Kelsay v. Mo. Pac. Ry. Co., 129 Mo. 362 l. c. 372.] Not only was he required to look but also to listen He must not venture blindly on the track without first using his senses of hearing and sight. [Lien v. Railroad, 79 Mo. App. 475, l. c. 480.] And if for any reason his sight was obstructed that was all the more reason for a greater exercise of his sense of hearing.

The statute, section 3140, Revised Statutes 1909, required the engineer to ring the bell a distance of eighty rods from the crossing and keep ringing it until the crossing is passed, or to sound a whistle at least eighty rods from the crossing and to sound it at intervals until the crossing is reached, and makes the road liable in damages for a failure to do so, but provides that "nothing herein contained shall preclude the corporation sued from showing that the failure to ring such bell or sound such whistle was not the cause of such injury." And while evidence of an injury at a public crossing, where the statutory signals are not given,

makes a prima-facie case and throws the burden of proving nonliability on the defendant (Weigman v. Railroad, 223 Mo. l. c. 721), yet this does not abrogate the rule of contributory negligence. Even if the statutory signals were not given, if a person by exercising ordinary care could have avoided injury and fails to do so, he cannot recover, since he is guilty of contributory negligence. [Hayden v. Railway, 124 Mo. 566; Huggart v. Railway, 134 Mo. 673; Green v. Railway, 192 Mo. 131; Smith v. Railway, 150 Mo. App. 1; Crumpley v. Railway, 111 Mo. 152.] And while in certain cases it is said that a person about to cross a railway has a right to presume that the statutory signals will be given, it is only where the person is paying attention, and *can neither see nor hear anything indicating that a train is coming,* that he can assume, without negligence, that, if one were coming, the signals would be given. [Donahue v. Railroad, 91 Mo. 357, l. c. 363; Hennayde v. Railroad, 45 Mo. 255, l. c. 261; Ernst v. Railroad, 35 N. Y. 9; Weigman v. Railroad, 223 Mo. 699, l. c. 719.] So that where a person can see and hear, *or can do either,* he cannot rely blindly upon any presumption that the signals will be given. "A railroad crossing is within itself a signal of danger. The law imposes upon the traveller the duty of exercising caution at such places. He must make some effort to find out if there is an approaching train before he drives upon the tracks. He can close neither his eyes nor his ears. The means of self-protection given him must be used." [Burge v. Railroad, 224 Mo. 76, l. c. 94.]

If, therefore, the collision had occurred on a clear day of ordinary weather, no one could well contend that deceased was not guilty of contributory negligence in driving upon the crossing in front of this swiftly moving and heavy train. The question then arises what effect or change in that regard does the foggy

condition of the weather present so as to take his act out of the realm of contributory negligence?

So far as his ability to *hear* the train is concerned, there was nothing, in the way of obstructions or of fog, to prevent that. Not a witness declared that they had any difficulty in hearing on account of the fog. On the contrary, all of the evidence was that the day was still, there was no wind blowing, and *all* of them heard the train easily and distinctly at distances varying from a quarter to three-quarters of a mile away, and that within an exceedingly short time prior to the accident. Some of these witnesses were in closed houses at the time. Neither did any of them have any difficulty in locating the place and direction from whence the sound came and the character of the train. In addition to this, it was conceded that the train consisted of an engine and caboose with twenty-three cars loaded with coal comprising a train of 1100 tons going thirty-five miles an hour over a trestle the north end of which was scarcely 100 yards southeast of the crossing. One of the witnesses spoke of the roar and rumble it made in going over this trestle, and it is a well-known fact that the noise and roar is increased by a train passing over such a structure.

As to the ability to *see* the train, notwithstanding the fog, plaintiff had only three witnesses who could be said to speak on this point. One of these was young Henderson, who saw the train a quarter of a mile away and recognized it as a freight at the moment it was passing over the trestle. The second was P. M. Ward, who heard it a half mile away and saw it a quarter of a mile distant. The third was Woodson Swope, who was at Whitton when the accident occurred, who did not test the fogginess of the atmosphere by looking at the train or any other object, but who when asked to what extent was the view obscured, expressed himself in these words: "Well, I don't suppose you could have seen anything very far. I don't suppose you

could have seen a train over fifty yards very much; I wouldn't judge that you could." Defendant had two witnesses who said they saw the train, one Bert Lumry, who was walking on the railroad toward the crossing from the northwest and saw and heard it before it reached the crossing and the other, Alvin Whitton, who was at Whitton and upon going outside saw the train fully half a quarter away and recognized it as a freight train.

If now it was the duty of deceased to both look and listen for the train, what grounds have we for saying that he is excused from negligence in not seeing or hearing it? As said in Burge v. Railroad, supra, l. c. 94: "In this case witnesses more unfavorably located than was deceased heard the "roar" of the approaching train. What the witnesses heard, the deceased could have heard had he been in the exercise of due care. What they saw he could have seen by the exercise of due care. The fact that they heard the approaching train is conclusive that he was not exercising his sense of hearing to determine whether or not there was an approaching train." Certainly he had no excuse for not *hearing* it, since everyone, who was in hearing distance at all, heard it. And the two who were in a position to know whether or not it could be *seen* at the time of the collision said *they saw* it. Can it be said under such circumstances that we can indulge in the *presumption* that deceased was in the exercise of ordinary care? Do not the uncontradicted facts destroy that presumption? As said in Burge v. Railroad, 244 Mo. l. c. 94: "There is no room for the presumption of care in this case. Such presumption is a presumption of fact, and upon the appearance of the facts in evidence the presumption takes flight, and no longer has a place in the case. [Higgins v. Railroad, 197 Mo. 318; Tetwiler v. Railroad, 242 Mo. 178; Morton v. Heidorn, 135 Mo. l. c. 617, and cases therein cited.]" Where the positive and uncontradicted facts, such as were

shown in this case, show that if deceased had taken those precautions which the law required of him to both look and listen, he would have been aware of the approach of the train, the presumption of due care cannot stand. [Tomlinson v. C. M. & St. P. Ry. Co., 134 Fed. 233; Rollins v. C. M. & St. P. Ry. Co., 139 Fed. 639.]

But it is said that Osborn faced an unusual and confusing obstruction to the free exercise of his senses of sight and hearing by reason of the fog. There is no evidence whatever that his hearing was interfered with. No one else had any difficulty in hearing the train. And while it is perhaps well known that in a dense fog, so dense that objects only a few feet away are not distinguishable, sounds are distorted and misleading, yet, such is not the case where the fog is of that character that objects can be seen fifty yards away. We are also reminded that the deceased was in an enclosed cart with his ears partly muffled. This, however, cannot serve to relieve deceased of negligence, but rather increased the degree of care required of him under such circumstances. The rule is well stated in 2 White on Personal Injuries on Railroads, sec. 1083, where it is said that it is the duty of a person intending to cross a railroad track to listen as well as look, and if dust temporarily obscures his view he must stop and wait to get a better vew, or *listen* for a train, and that a like rule obtains in a case where the view is obscured by falling snow or a fog, and a traveller who, under such circumstances, drives upon the track without taking the extra precautions demanded by the unusual conditions, cannot recover. A railroad crossing is a warning of danger and one who crosses it, knows he is encountering a danger, and must act with care proportionate to the danger. [3 Elliott on Railroads, sec. 1165.] If he is in an enclosed vehicle with his ears muffled and a fog is prevailing, these conditions, so far from relieving him of care, should increase the

amount of care to be taken. Ordinary care under normal conditions would not be ordinary care under such unusual conditions. For "no one can be said to exercise ordinary care who voluntarily encounters a danger that he knows is imminent, unless the situation and conditions are such as to enable him to see that he can proceed with safety." [Sanguinette v. Railroad, 196 Mo. l. c. 489.] "The measure of precaution to be observed by a traveller depends often upon the circumstances and surroundings." [Laun v. Railroad, 216 Mo. l. c. 579.] If the fog was so great that he could not see down the track for more than fifty yards then it was all the more incumbent upon him to listen. And where is there any evidence in the case from which even an inference can be drawn that *if he had listened* he would not have heard what *all the witnesses say they heard?*

The case at bar is not like the case of Weighman v. Railroad, 223 Mo. 699. In that case the view was hidden by an engine and long train of cars standing about eight feet from the side of the track; and the standing engine *by its noises prevented the plaintiff from hearing the approaching train,* and there was *no evidence that the latter made any noise to be heard.* [P. 721.] In the case at bar, the evidence is agreed that the train made a great noise and that everyone in hearing distance heard it and there were no obstructions to prevent deceased from hearing it. This shows, as said in the Burge case, that deceased "failed to hear, when to listen was to hear, because all the witnesses heard." So that, even if the evidence of Woodson Swope that a train could not be seen more than fifty yards be given the fullest weight and effect, yet, since that obstruction to deceased's sight would demand greater use of his hearing, and as the evidence shows that all others did hear, where is there any room for the presumption that deceased did listen? The evidence was that his sight and hearing were both good;

that the train was making a great noise. If his hear-
ing was good, and he listened, why did he not hear what
others heard? In the presence of the undisputed fact
that if he listened he could hear what others could hear,
and the further undisputed fact that all others did hear,
what basis is there for the presumption that he listened
but did not hear and should be relieved of negligence
because he failed to hear? "Presumptions of this
character are presumptions of fact—and the presump-
tion takes flight upon the appearance of the facts them-
selves. When the facts themselves are in evidence
there is no place for a presumption as to those facts."
[Burge v. Railroad, 244 Mo. 1. c. 95.]

The deceased and the engine reached the crossing
at the same moment. Calculations based on the rate
of speed each was shown to have been traveling, show
that when deceased was 100 feet from the crossing the
train was about 875 feet therefrom, less than a quarter
of a mile away, the distance at which others saw the
train at that moment. While deceased was travelling
from this 100-foot point to a point fifteen feet from the
track, where he was still in a place of safety, the train
travelled at least 675 feet nearer the crossing and with
its 1100 tons burden had thundered over the trestle
(the north end of which was 240 feet away) making a
noise which attracted the attention of persons in every
direction, further away and certainly not so well situ-
ated to hear, as was deceased. As said in Chicago, etc.,
Ry. v. Andrews, 130 Fed. 1. c. 71, quoted in Waggoner v.
Railroad, 152 Mo. App. 1. c. 179, common knowledge
tells us that such a train over such a track makes a
great noise not rendering it possible for it to come un-
pectedly upon one who is possessed of a good sense of
hearing and is reasonably employing it under circum-
stances which otherwise permit its free use.

Viewing the case under every aspect possible in the
light of the evidence, the presumption that deceased
was in the exercise of ordinary care was clearly over-

come by all the evidence as to the fact that the train could have been heard had deceased listened. And as to the possibility of its being seen the facts disclosed by the evidence of all the witnesses, who were so situated as to have the opportunity for observation, show that it could have been seen had deceased looked. Where credible witnesses, having opportunity for observation, testify that a fact exists no conflict arises from the expression of an opinion to the contrary by another witness where it affirmatively appears that his situation was not such as that he could have observed and formed an opinion concerning the fact about which he attempts to express an opinion. [McGrath v. Transit Co., 197 Mo. 97; Heinze v. Railroad, 71 Mo. 636; Bennet v. Railroad, 122 Mo. App. 703.] A witness, who has sufficient knowledge of the facts and is so situated as to be able to form an opinion, may give that opinion as to the distance an object could be seen, or the distance one object was from another, but such evidence is of a weak character as compared to positive testimony on the subject; and where the witness is shown not to have been present at the time and place in question so as to have been able to form an opinion on the matter, it will not have sufficient probative force to create a conflict with such other positive testimony. [McCreery v. Railway, 221 Mo. l. c. 28-9; Markowitz v. Railroad, 186 Mo. l. c. 359.] While a witness may testify that certain things could or could not have been seen from one point to another, it must be shown that he was in a position to form an opinion and did form it, and that his statement is something more than a mere guess. However, if Swope's estimate as to the distance the train could be seen on account of the fog is entitled to probative force so as to create a conflict in the evidence as to obstructions to sight, there was no conflict whatever as to there being any trouble in hearing the train. If deceased could not see on account of the fog then he was

required to use his sense of hearing, and if he failed to exercise ordinary care in that regard he cannot recover. The undisputed evidence shows that he did fail in that regard, and hence the judgment must be reversed. It is so ordered. All concur.