Kelly, *Appellant*, v. The Chicago & Alton Railroad Company.

1. **Railroads**: TRAVELLER WITH TEAM: CROSSING TRACK. A traveller, with a team, crossing a railroad where it intersects a highway, is not required to stop absolutely and always, or to fasten his team and go forward on foot to a point where he can look up and down the track.

2. ——— : ——— : ———: DUTY TO STOP AND LISTEN. Where such traveller, however, is about to cross a railroad track on a public street crossing and at hours when trains are passing, he should, if he cannot see the track, listen, and if necessary for that purpose, on account of the noise made by the wagon, he should stop and then listen for the train before blindly venturing on the track.

3. ——— : FAILURE TO RING BELL AT CROSSING : EVIDENCE. In an action against a railroad for injuries to plaintiff's team by one of its trains by reason of the failure to ring the bell of the locomotive within eighty rods of the crossing, evidence to show connection between such failure to ring the bell and the injury to the team is irrelevant and unnecessary.

4. **Evidence** : DECLARATIONS OF AGENT. In such action, a conversation had between a brakeman of the train and plaintiff's driver after the occurrence of the accident and the stopping of the train, in which the driver stated that he was not looking, or listening, or thinking about the train, held inadmissible, following *Adams v. Ry.*, 74 Mo. 553.

*Appeal from Jackson Circuit Court.*—Hon. F. M. Black, Judge.

Affirmed.

*Wash Adams* for appellant.

(1) The court erred in permitting the witness, Melver, on behalf of respondent, to testify to a conversation occurring between him and appellant's driver after the injury had happened. It was not a part of the *res gestæ*

Kelly v. The Chicago & Alton Railroad Company.

and was incompetent. *Adams v. Ry.*, 74 Mo. 553 ; *Mc-Dermott v. Ry.*, 73 Mo. 516. (2) The court committed error in refusing to give the first and third instructions asked by appellant. *Harlan v. Ry.*, 65 Mo. 25 ; *Meyers v. Ry.*, 59 Mo. 223 ; *Kelly v. Ry.*, 75 Mo. 138 ; *Singert v. Ry.*, 14 Rep. 405. (3) The court erred in giving defendant's instruction which told the jury that "if plaintiff's servant in charge of the wagon and team might have seen or heard defendant's approaching train and failed to do so by his own want of care and attention, plaintiff could not recover." Plaintiff's driver was only required to exercise that degree of care which men of ordinary prudence and caution are accustomed to exercise under similar circumstances. *Kennedy v. Ry.*, 36 Mo. 351 ; *Ry. v. Moore*, 24 N. J. L. 824 ; *Imp. Co. v. Stead*, 95 U. S. 161 ; *Ry. v. Crawford*, 24 Ohio St. 639 ; *Ry. v. Stout*, 53 Ind. 143 ; *Ry. v. Smith*, 16 Rep. 345 ; Wharton's Law of Negligence, sec. 48. The instruction was misleading and otherwise objectionable. (4) The instruction given by the court of its own motion was likewise erroneous. It was equivalent to saying, plaintiff could not recover unless the *driver stopped* the team before venturing to cross the railroad track. The duty of stopping, absolutely, should not be crystalized into a "procrustean rule." *Kennedy v. Ry.*, 36 Mo. 363 ; *Plummer v. Ry.*, 14 Rep. 368 ; *Ry. v. Graves*, 69 Texas, 339 ; *Nehrbos v. Ry.*, 62 Cal. 320 ; *Kelly v. Ry.*, 29 Minn. 1 ; *Davis v. Ry.*, 47 N. Y. 402 ; *Kellogg v. Ry.*, 79 N. Y. 76 ; *Duffy v. Ry.*, 32 Wis. 274 ; *Eilert v. Ry.*, 48 Wis. 608 ; *Bunting v. Ry.*, 14 Nev. 358.

*Lathrop & Smith* for respondent.

(1) The demurrer to evidence should have been sustained, and the judgment being for the right party, this court will not reverse, even if it should be of opinion that errors were committed in the admission or exclusion of evidence, or the giving or refusing of instructions.

*Harlan v. Ry.*, 64 Mo. 480 ; *Fletcher v. Ry.*, 64 Mo. 484 ; Whar. on Neg., sec. 384 ; Shear. & Redf. on Neg., secs. 488, 488 *a* ; *Gorton v. Ry.*, 45 N. Y. 662 ; *Zimmerman v. Ry.*, 71 Mo. 476 ; *Henze v. Ry.*, 71 Mo. 636 ; *Purl v. Ry.*, 72 Mo. 168 ; *Turner v. Ry.*, 74 Mo. 602 ; *Powell v. Ry.*, 76 Mo. 80 ; *Lenix v. Ry.*, 76 Mo. 84. (2) Defendant's evidence showed that its servants used every means in their power to prevent the injury after they became aware of the danger in which plaintiff's property had been placed. Hence, plaintiff had no right to recover upon that theory, and defendant's right to have its demurrer to evidence sustained was not affected. *Harlan v. Ry.*, 65 Mo. 22 ; *Moody v. Ry.*, 68 Mo. 470 ; *Purl v. Ry.*, *supra*. (3) The questions asked by plaintiff's counsel, and excluded by the court, were all improper. They simply called for the opinions of the witnesses. The office of witnesses is to detail facts ; that of the jury to draw conclusions from those facts. (4) The conversation between plaintiff's driver and the brakeman happening as it did almost at the very time of the accident and in full view of the damaged property, was competent as part of the *res gestae*. *Brownell v. Ry.*, 47 Mo. 239 ; *Mosley v. Ins. Co.*, 8 Wall. 397 ; *Ry. v. Coyle*, 55 Pa. St. 402. (5) Mann, the fireman, testified that he called Mead's, the engineer's, attention to the fact that he was ringing the bell. Mead was permitted to testify that he remembered Mann's calling his attention to that fact. In this there was no error. The matter testified to by Mead was a "verbal fact," and not hearsay. (6) Plaintiff's refused instructions were all properly refused. The first left to the jury to determine whether plaintiff's driver was exercising the ordinary care of a prudent man, without having the court instruct them as to what care a prudent man was obliged to take. *Zimmerman v. Ry.*, *supra*. The second instruction was an indirect attempt to have the court comment on the weight to be given to the evidence and was not justified by the conduct of any

of the witnesses on the stand or their manner of testifying. The third instruction was properly refused, because it was not in the form required by the decisions of the Supreme Court, and because there was absolutely no evidence to support it. *Harlan v. Ry.*, *supra.* (7) The instructions given for defendant and that given by the court of its own motion were in exact accordance with the law as the cases already cited conclusively show.

RAY, J.—This action was brought by plaintiff to recover damages for killing a horse and injuring a mule and harness and wagon by defendant's cars at the crossing of Lydia avenue, over the railroad of defendant, in Kansas City, Missouri. The negligence charged in the petition was a failure to ring the bell within eighty rods of the crossing, and running the train at a speed in excess of six miles per hour, contrary to the city ordinance. The answer was a general denial and a plea of contributory negligence.

Evidence offered by plaintiff for the alleged purpose of showing the connection between the failure to ring the bell, and the injury to the wagon and team, and opinions of the witnesses in that behalf were excluded by the court. The court also permitted defendant's brakeman to testify over plaintiff's objection to a conversation which he had with the driver of the plaintiff after the accident had happened and the train stopped, to the effect that he was not looking, noticing or thinking about the train. At the close of the plaintiff's evidence the court refused a demurrer thereto. Under the instructions given and the evidence in the cause the jury found a verdict for defendant, on which judgment was entered, and plaintiff has appealed therefrom to this court.

We will first give some of the facts which we understand to be undisputed, and others as to which there is a conflict, more or less marked, in the evidence.

Lydia avenue, where the collision occurred, crosses a number of railroad tracks, including the main tracks of the defendant, and the Narrow Gauge Railroad, and several other switch tracks leading to the elevator. About eighty feet east of the crossing, defendant's side track (number one) connected with its main track, and some fifty feet still further east on this side track was the limit post, which marked the extreme point on the side track towards its western connection with the main track beyond which cars could not be placed without interfering with the passage of trains on the main track. On this side track and beyond the limit post thereon were, as is conceded, some box cars, the evidence being somewhat conflicting as to their number, and how far, if at all, they operated to obstruct the view of the driver as he approached the main track. Much of plaintiff's evidence as well as the entire evidence of the defendant in that behalf is to the effect that at a distance from the main track, variously estimated at from four or five to twenty-five or thirty feet, the driver in approaching would be able to see up the track to the east a distance variously estimated by the witnesses at from one or two hundred feet to a half or three-fourths of a mile. The map in evidence in the cause is, we believe, not questioned as to its general correctness, and an inspection of the same indicates, we think, that at a point somewhere between these distances thus estimated, a view could be had for some distance beyond said limit post at least. There is, however, evidence on the part of plaintiff that the box cars would not cease to be an obstruction to the view of the track in that direction until the driver arrived at or very close to the main track.

There is a marked conflict in the evidence as to whether the bell was ringing or not, but it is undisputed and conceded that the speed of the train at the time was in excess of six miles per hour, which was the maximum allowed in the city limits by the city ordinance, the esti-

mate thereof by the witnesses ranging from ten or twelve to twenty or twenty-five miles per hour. It is conceded that the collision occurred about nine o'clock in the morning, the day being clear, and that the damage was done by one of defendant's regular passenger trains then due and arriving from the east.

It is also conceded that after passing the first track some one hundred and sixty or one hundred and eighty feet from main track, driver did not stop the team before entering upon the main track and that he did not see the train until the engine struck or was about to strike the team. The evidence also varies somewhat as to whether the team was struck by the pilot, or cow catcher, commonly so called, or some portion of the side of the engine. There is evidence to show that if the driver had stopped and listened he could have heard the train a good distance off, which indeed is, we think, an obvious and necessary inference, where there is no evidence that the wind is blowing so as to interfere, and nothing otherwise appears in the circumstances and locality to obstruct the sound. It is also undisputed that plaintiff's driver and his team were familiar with the crossing, having passed it several times every day for some time in hauling rock, and that he frequently on other occasions stopped the team at and between the various tracks to see if trains were coming, and to allow them to pass, as was also generally and often done by others as occasion required. Having proceeded thus far in the statement of the general facts and features of the case as shown by the evidence, we deem it important and necessary to give a summary of what the witnesses say as to the conduct of the driver as he approached the track, and at the time of the collision and injury to the wagon and team. This involves, we are aware, some repetition and prolixity, perhaps, but this is unavoidable.

As bearing upon this question, we quote from the

witnesses of the occurrence, introduced by plaintiff, portions of their evidence as follows :

Oliver Coleman, plaintiff's driver, testified :

"I was driving a load of rock on Lydia avenue, and drove up to the crossing to come across. I stopped for the switch engine to go across. Lydia avenue is a pretty rough street, considerably travelled. I was going north towards the river.    *    *    *    The cars on this switch obstructed my view of the train coming in at that time, and I heard no bell ringing. I was looking ahead when I came along there. I looked up and down the track to see if a train was on the track and couldn't see no train. The box cars in front of me prevented me from seeing any."

On cross examination Coleman testified :

*  *  *  "I had a rock wagon with no bed on. I was sitting in front on the right hand side, going north. There was a man on the wagon with me. He was on the back end of the wagon. We were not talking. I had a heavy load of rock and was headed right towards the river, but the wagon did not make very much noise. The road is rather rocky and rough and I would have to watch out pretty well. A train on the Narrow Gauge road from Kansas City passed along and I was watching that train, and as soon as the last car got beyond the street I drove right on the Chicago & Alton track. The horse got his front feet over on the first rail when he was struck. It was the beam that struck him as well as I can remember."

Q.    "Now you say five or ten feet before you got to the track, you could see down the track for a half mile about?"

A.    "Five or ten feet I could see."

Q.    "By the time you got up within fifteen feet you could see half a mile?"

A.    " Yes sir."

Q.    " You say the moment the fore feet of the horse

got over the track the engine struck them; when your horse got up to the track the engine couldn't have been over one hundred and fifty feet from you?"

A. "I couldn't know. I didn't see until it struck."

Q. "But from a point twenty or twenty-five feet you could see up the track for a half a mile?"

A. "I could see, but I didn't see."

Pepperd, who was a letter carrier, on his duty in that behalf, in that part of the city, was asked, if in the position the driver was he could see the train coming in, and answered, if it had not been for the cars on the side track he could have seen out without any trouble. On cross-examination, he said that when he first saw the driver he was about twenty-five or thirty feet from the main track. Another man sat behind him, but he was not close enough to tell whether they were talking. The driver was facing to the northwest and that he did not notice him change his position; that at the distance of ten or fifteen feet from the main track he could have seen it some distance, and that he thought the driver was noticing the Narrow Gauge train more than anything else.

Sullivan, who was at the west cut on Lydia avenue, testified in part as follows:

Q. "Do you recollect how he was sitting on the wagon?"

A. "Toward the Chicago & Alton track as it came from the east."

Q. "Watching the team?"

A. "I see him have the lines in his hands and looking straight ahead of him."

Q. "Did he change his position after crossing the switch until he got on the main track?"

A. "I didn't see him change."

\* \* \* \* \* \* \* \* \*

Q. "You say they drove on until the horse and mule just stepped onto the track?"

A. "Yes."

Q. "About how far could he see?"

A. "I don't know."

Q. "Could he see one hundred and fifty yards?"

A. "I don't think he could see over a hundred yards."

Q. "Up toward the clearance post a man driving along Lydia avenue at a distance of fifteen or twenty feet from the main line of the Chicago & Alton track, could he see about one hundred yards?"

A. "Just about."

On re-examination, the witness thought the cars would not cease to be an obstruction to the view until the driver was very close to the main track. There is little circumstantial variety in the statements of the other witnesses of the transaction introduced by the plaintiff. Mrs. Sullivan, who was on the hill above the elevator, and Mr. Wood, who was north of all the tracks and on the side next the river, testified that they saw the men on the wagon, that they were not close enough to tell whether they were talking with each other, that as soon as the Narrow Gauge train passed, the driver of the team drove onto the main track of defendant without stopping, that he was seated on the front end of the wagon with the lines in his hands, that he was looking straight ahead, or looking north, and that they did not notice him change his position.

The defendant introduced a number of witnesses who saw the transaction, and among them Mrs. Sells, who came from McEvoy's grocery store beyond and north of the tracks, and saw defendant's train coming in, and also saw the wagon and team coming towards the track. She says the colored men were laughing and talking and not looking out for the cars; that when she got to the Narrow Gauge track she motioned to them and "hol-

lered" as loud as she could to stop, but that she didn't think the driver heard her, as he did not look up, and that he could have stopped easy after she hallooed, and saved the team.

The witness, Cameron, designated where he was by pointing out on the map, and we are, therefore, not able to give his exact position. But he was somewhere between the frog, which is about eighty feet east of the crossing, and the elevator, and was going west towards the wagon. The men were on the front of the wagon facing towards the horse and their backs toward him and partly towards the train as it was coming. He heard the cars coming. He thought they would stop. They seemed to be very busy talking, and he stood and watched them. They drove right up to the track. The cars had then got pretty near on them and he then hallooed three or four times. He says he heard Mrs. Sells halloo to them, but don't think they heard either of them, and that they neither of them changed their positions. That after shouting at them to stop he ran a few steps towards them and the team was then struck, as he thought, by some part of the side of the engine.

Mr. Porrd, also employed at the elevator, testified he was about four hundred feet from Lydia avenue crossing, and his attention was attracted by hearing Cameron calling to the men; that he heard the train coming in, and saw the team which was close, and he judged only four or five feet from the track, and that the train was then very near. He described the driver as sitting on the west side of the wagon between the front and rear wheels with feet projecting over. That his back was towards him and the train, and his face turned northward and towards the city, that he never stopped, and that the team was struck by some portion of the side of the engine.

So far as the men in charge of the train are concerned, the evidence shows that the engineer was seated

on the right hand side of the engine going west and on the northerly or river side, that the team as it came upon the south side did not get far enough upon the track for him to see it. That the fireman hallooed when they were very close, he supposed, some fifteen or twenty feet, and that he then applied the air brakes with full force, but did not have time to reverse the engine, and that it was impossible to stop. The fireman testified that when he first saw him he was some distance down the street, that when he next observed him he was far enough away to stop, and he thought he was going to as other teams did. That the next moment the team stepped on the track and he hallooed "whoa." That after he drove onto the track he thought he was asleep or going to sleep.

The brakeman, McIres, testified that he was on the platform leaning out and that he saw the man just as he drove up to the track, that he didn't think the team got on the track but were struck by the cross-bar or cylinder; and when he first saw him the engine was about thirty feet distant. This is a statement somewhat extended of the testimony in the case in this behalf, the effect of which we will now proceed to consider.

There is little if anything in the evidence of Mr. or Mrs. Sullivan, or Wood, that Coleman, as he drove towards the track in his wagon loaded with rock, was either looking or listening for the train. When they saw him he was driving along with the lines in his hand, and looking ahead, looking north and towards the river, and they all say they did not see him change his position. In this position, as thus described by them, he could not well see the train until it was well in front or near the crossing. Pepperd, who was the letter carrier, described his attitude and appearance much the same way, except that he says the driver's face was towards the northwest, in which position his back would be partly turned towards the train as it was coming, and he fur-

ther states that he thought he was paying more attention to the Narrow Gauge train than to anything else. None of these witnesses were close enough to say whether he was talking with the other man on the wagon with him, so that about all the evidence in the case that he was not carrying on a conversation with this colored man, Shaw, and that he was looking and listening for the train as he approached the track, is in what the driver himself says in these behalfs. It is his evidence, if any, that makes any conflict upon this issue of contributory negligence which, we think, is the vital question in this case.

His statements in this behalf are, we think, inconsistent, and perhaps irreconcilable with other direct and unequivocal statements made on cross-examination. Among other things, he was asked upon cross-examination if at a point twenty-five or thirty feet from the main track he could not see up the track for a half mile, and he answered, "I could see, but I didn't see." But waiving this and other variances in his testimony, and conceding these were matters going to his credibility, and were for the jury, the question is whether as a matter of law we are not bound to deny a right of recovery to the plaintiff in this case. The driver, Coleman, testifies that as he came along between the tracks he looked up and down the track to see if a train was coming and could see no train. But he also testifies that he could not see out, that the box cars on the side track prevented him from seeing. When he thus says in such connection, that he looked up and down the track, he manifestly means, we think, that he looked in the direction he knew or supposed the track to run in that locality, for if he could not see the train on account of such obstruction he could not see the track for the same reason. The question then is, what did the law require of him in that behalf under such circumstances.

Manifestly, it then devolves on him the duty of lis-

tening, and upon this question, whether or not the driver in fact listened in this case for the train, we find no declaration in his evidence anywhere in which he expressly so states. He was asked, it is true, several times if he heard any bell, and he says he did not, and that the bell was not ringing, but he was not asked, so far as we have been able to see, whether he heard the train, and he does not say whether he did or not. If he does so state it has escaped our observation after a very careful reading of his entire evidence in the record. But conceding that as he looked, heard no bell, and states that none was ringing, we may infer that he listened, as he drove along, for the train, the further question arises as to what, if anything, in view of his mode of travelling and his surroundings at the time the law required of him before venturing upon the track thus obstructed to his view. In devolving the duty of listening upon him where he cannot sufficiently see the track, the law supposes that he is in a position to listen and that the circumstances are such as to make this means ordinarily adequate for his safety available. If his wagon or other mode of conveyance and other facts and circumstances are such as materially interfere with and obstruct his hearing, he manifestly cannot perform this duty so long as these difficulties exist. Where these obstructions to his sight and hearing are obvious and known to him, and in part at least under his control at the time, he is, we think, bound to act in reference to this state of facts, and to put himself in a proper situation in which he might reasonably be able and likely to see or hear an approaching train. It is of but little moment to say in such case that he looked, when as he testifies he could not see, or that he listened, if it was obvious that his hearing would thus be interfered with and obstructed. As he approached he had observed and was paying attention to a train on the Narrow Gauge track, then going east, from which direction the train in question was

coming at the time. He was driving along the road on his wagon which was loaded with rock, and we think it is obvious and must have been reasonably well known to him, that these noises would materially interfere and deprive him of any fair opportunity to hear the train.

It is, we think, somewhat remarkable that this driver and man with him on the wagon should have been the only ones in that locality at the time, who did not either see or hear the train until it was in the act of striking the team. They were the only ones desiring and intending to cross the track at that time, and the only ones whose safety was involved and who, we would naturally suppose, would, therefore, be the most vigilant and observant, and most likely to see and hear a train on the track they were thus intending to cross. They not only failed to either see or hear the train, but they also failed to observe the motions or hear the calls to stop made by the witness, Mrs. Sells. She was north of the track directly in front of them and called to them from the Narrow Gauge track which is only eighteen or twenty feet north of the main track of the defendant, and they were at a distance from the main track which she estimates less than the width or length of the court room. They also failed to hear the witness, Cameron, when he called to them several times to stop. His shouts attracted the attention of the witness, Porrd, who seems to have been about as far off as the driver and team, and Cameron testified that he heard Mrs. Sells, who was on the opposite side of the team and tracks, so that these men on the wagon, though called on from both sides by these parties, nevertheless failed to hear either of them. Other witnesses for plaintiff say, as he does, that they did not hear the bell, and that it was not rung, but they all heard the train and what else was there to prevent his doing so, if he was listening therefor, unless it was the noise of his wagon whilst going along? We do not understand the law to be, nor do we so hold, that

it is the duty of the traveller, where the highway crosses the railroad track, absolutely and always to stop, or to fasten his team and go forward on foot to a point where he can look up and down the track, but as applied and limited to the facts of this case at such crossings and at such hours when trains are passing and liable to pass at any time, as was well known to said Coleman, we think it does require of him, where he cannot see the track, to listen, and, if necessary for that purpose, on account of the noise made by his wagon, to stop and listen for the train before venturing blindly upon it. This does not, we think, exact or require any unreasonable or extraordinary prudence or precaution on the part of the traveller, but is only such prudence as a reasonable man would take for the protection of his own person and property under such circumstances. Such is, we think, the doctrine and rule declared by this court heretofore in a number of cases. *Purl v. Railroad*, 72 Mo. 168; *Henze v. Railroad Co.*, 71 Mo. 636; *Harlan v. Railroad*, 64 Mo. 480; *Fletcher v. Railroad*, 64 Mo. 484.

The evidence offered to show the connection between the failure to ring the bell and the injury to the wagon and team was properly excluded for the reason that under our later decisions upon this question, such evidence in this class of cases is irrelevant and unnecessary. 82 Mo. 196; 81 Mo. 521; 78 Mo. 578; 76 Mo. 494 and 498; 83 Mo. 386.

The evidence admitted as to the conversation between the brakeman and plaintiff's driver was, we think, incompetent under the principle and rule declared by this court in the case of *Adams v. Railroad*, 74 Mo. 553. But notwithstanding this was error, as we are of opinion that upon all the evidence offered exclusive of the objectionable evidence, the plaintiff was not as a matter of law, entitled to recover, the judgment was, we think, for the right party and ought not to be disturbed.

For these reasons the judgment of the circuit court

is affirmed, in which all concur, except Sherwood, J., who concurs in the result. Black, J., is of opinion that the conversation between the brakeman and plaintiff's driver was competent and admissible as a part of the *res gestae*, otherwise he concurs fully in the opinion.

SHERWOOD, J.—In view of the foregoing opinion may I be permitted to inquire what has become of the rule announced in *Petty's case, ante,* p. 306?