NELLIE A. UNDERWOOD, Respondent, v. ST. LOUIS IRON MOUNTAIN AND SOUTHERN RAILWAY COMPANY, Appellant.

Springfield Court of Appeals, June 29, 1914.

1. **RAILROADS: Crossings: Care to be Exercised on Entering upon.** A railroad track is itself a warning of danger and no one has a right to heedlessly enter upon such danger relying on the person running an approaching train to give him warning of that approach, without himself taking every reasonable precaution to inform himself as to such approaching train.

2. **——: ——: Duty of One Entering Upon: Stop, Look, Listen.** It is the duty of a person before entering upon a railroad crossing to look and listen, if possible, and when stopping is essential to make looking and listening effectual, the person must stop.

3. **——: Death at Crossing: Evidence Examined: Contributory Negligence: Question for Jury.** Action for death of husband killed by collision of his buggy with defendant's train at railroad crossing. Evidence examined and reviewed. *Held*, that the question whether the deceased was negligent in not stopping to look and listen before entering upon the crossing was properly for the jury and that deceased was not guilty of contributory negligence as a matter of law.

4. **EVIDENCE: Statutory Warnings at Railroad Crossing: Negative Evidence: Weight of, for Jury.** Concerning negative evidence as to the failure of the defendant railroad to give statutory signals at a crossing, when the opportunities and circumstances are such as to give such negative evidence some probative force, its weight is for the jury as is also its credibility.

5. **RAILROADS: Death at Crossing: Negligence: Evidence Reviewed: Jury Question.** Action for death of husband killed by collision of his buggy with defendant's train. Evidence as to whether or not the company was negligent in failing to give the proper statutory signals, examined and the question considered properly submitted to the jury.

6. **RAILROADS: Signals at Crossings: Must Be Continuous.** The statute requiring crossing signals to be given not only requires that same be given at a point eighty rods from the crossing but also that the same be continued till the crossing is reached.

7. **RAILROADS: Death: Crossing Collisions: Last Chance Doctrine: Burden of Proof.** In an action for the death of plaintiff's husband occasioned by collision with defendant's train at a railroad crossing, the burden is on the plaintiff to bring her case within the purview of the humanitarian or last chance doctrine.

8. ————: **Crossing Collision: Care Required of Engineer.** The law does not exact of a railroad engineer that he act instantly and at the same time in the most intelligent manner in cases of emergency.

9. ————: **Personal Injuries: Liability: Errors of Judgment.** Liability does not arise against a railroad company merely on account of errors of judgment of the engineer or because of his failure to act instantly in emergency cases.

10. ————: **Death at Crossing: Evidence: Humanitarian Doctrine, Not Applicable When.** In an action for the death of plaintiff's husband in a collision with defendant's train at a railroad crossing, evidence reviewed and *held* that the court was guilty of error in submitting the case on the humanitarian doctrine.

Appeal from Jasper Circuit Court, Division No. One.— *Hon. Joseph D. Perkins,* Judge.

REVERSED AND REMANDED.

*R. T. Railey, A. E. Spencer* and *Barbour & Mc-David* for appellant.

(1) Plaintiff's husband was guilty of such contributory negligence as a matter of law as debars her recovery. One who approaches a railroad crossing where his view and hearing are obstructed or interfered with must look and listen for the cars as soon as the obstruction is passed and a failure to do so will bar his right of recovery in case of injury. The duty of the traveler to look and listen is a continuing one until the crossing is passed. Jackson v. Railroad, 171 Mo. App. 430; Kelsay v. Railroad, 129 Mo. 362; Hayden v. Railroad, 124 Mo. 566; Gordan v. Railroad, 153 Mo. App. 555; Drake v. Railroad, 51 Mo. App. 562; Dey v. Transit Co., 140 Mo. App. 461; Dyrcz v. Railroad, 238

Mo. 33; Farris v. Railroad, 167 Mo. App. 392. (2) The surroundings may be such as to impose upon the traveler the duty of stopping, looking and listening. Elliott on Railroads (2 Ed.), Sec. 1167; Campbell v. Railroad, 175 Mo. 161; Hornstein v. Railroad, 195 Mo. 440; Wands v. Railroad, 106 Mo. App. 96; Masterson v. Railroad, 58 Mo. App. 572; Kelly v. Railroad, 88 Mo. 534; Henze v. Railroad, 71 Mo. 636; Killian v. Railroad, 86 Mo. App. 473; Kelsay v. Railroad, 129 Mo. 362; Hook v. Railroad, 162 Mo. 569; Walker v. Railroad, 193 Mo. 453; Maddinger v. Power Co., 152 Mo. App. 453; Hixson v. Railroad, 80 Mo. 335; Grocer Co. v. Railroad, 89 Mo. App. 534; Stepp v. Railroad, 85 Mo. 229; Jackson v. Railroad, 171 Mo. App. 430; Damrill v. Railroad, 27 Mo. App. 202. (3) Under the uncontroverted facts in this case plaintiff cannot recover under the humanitarian doctrine. It requires more than a showing of a mere possibility that the accident might have been averted to bring a case within the operation of the humanitarian doctrine. The verdict in this case is the result of mere guess and speculation. Markowitz v. Railroad, 186 Mo. 350; White v. Railroad, 159 Mo. App. 508; Guyer v. Railroad, 174 Mo. 344; Hawkins v. Railroad, 135 Mo. App. 524; Wilkerson v. Railroad, 140 Mo. App. 306; Rollison v. Railroad, 160 S. W. 994. (4) Where an action is predicated on a breach of the humane duty, the burden is on plaintiff to show affirmatively that he was in imminent peril, was unconscious thereof, and that, had defendant been in the exercise of reasonable care, it would have had knowledge of those facts in time to avert the injury by a reasonable employment of the means at hand. Rissler v. Transit Co., 113 Mo. App. 120; Boyd v. Railroad, 105 Mo. 371; Brude v. Railroad, 123 Mo. App. 629; Dyrcz v. Railroad, 238 Mo. 33; Haffey v. Railroad, 154 Mo. App. 493; Pennell v. Railroad, 153 Mo. App. 566; Wilkerson v. Railroad, 140 Mo. App. 306; Moore v. Railroad, 176 Mo. 528; Veatch v. Railroad, 145 Mo.

App. 232; Davis v. Railroad, 155 Mo. App. 312; Maloy v. Railroad, 84 Mo. 270. (5) The two instructions, A and B, given for the plaintiff are inconsistent and cannot stand together and the giving thereof constitutes reversible error. Krehmeyer v. Transit Co., 220 Mo. 639. (6) The giving of plaintiff's instruction A was error. When an instruction for plaintiff authorizes a verdict for plaintiff it must cover the whole case as embodied in his petition and submit to the jury the varying phases of the case and grounds of recovery, and if it fails to do so it constitutes reversible error. Wilkes v. Railroad, 159 Mo. App. 711; Phelan v. Paving Co., 227 Mo. 713; Packing Co. v. Mertens, 150 Mo. App. 583; Kelley v. St. Joseph, 170 Mo. App. 358; Scanlan v. Gulick, 199 Mo. 449; Miller v. Telephone Co., 141 Mo. App. 462; Burton v. Railway Co., 111 Mo. App. 617; Crews v. Lackland, 67 Mo. 619; Birtwhistle v. Woodward, 95 Mo. 113; Brownlow v. Wollard, 66 Mo. App. 636; Flynn v. Bridge Co., 42 Mo. App. 529. (7) The giving of plaintiff's instruction B on the humanitarian doctrine was error. There is not a particle of evidence to authorize or justify the giving of this instruction. It is error to submit to the jury an issue upon which there is no evidence. Black v. Railroad, 217 Mo. 681; Henry v. Mining Co., 144 Mo. App. 362. (8) This instruction is erroneous in that it does not require the jury to find that plaintiff's husband was unconscious of his dangerous situation, and that the engineer realized or should have realized that he was unconscious thereof; and leaves out of consideration the danger signals which all concede were given before the engine reached the crossing. Keele v. Railroad, 151 Mo. App. 364; Wasner v. Railroad, 166 Mo. App. 215; McGee v. Railroad, 153 Mo. App. 492; Bennett v. Railroad, 242 Mo. 137; Pennel v. Railroad, 153 Mo. App. 566; Bennett v. Railroad, 122 Mo. App. 703; Boyd v. Railroad, 105 Mo. 371.

*I. V. McPherson* and *James A. Potter* for respondent.

(1) No error was committed in refusing defendant's peremptory instruction. Plaintiff's evidence showed a failure on the part of the defendant to give the statutory signals and the death of her husband on a public crossing, and her evidence also failed to show any contributory negligence on the part of her husband. This evidence entitled her to go to the jury. R. S. Mo. 1909, Sec. 3140; Buesching v. Gas Light Co., 73 Mo. 219; Weller v. Railroad, 164 Mo. 180; Green v. Railroad, 192 Mo. 143; Tetweiler v. Railroad, 242 Mo. 189; Riska v. Union Depot Co., 180 Mo. 188. (2) Unless a conclusion of contributory negligence is the only conclusion that can be reasonably drawn from the facts and circumstances in evidence, a demurrer should be overruled. Campbell v. Railroad, 175 Mo. 172; Jackson v. Railroad, 156 S. W. 1011; Gratiot v. Railroad, 116 Mo. 450; Weller v. Railroad, 120 Mo. 635; Moberly v. Railroad, 17 Mo. App. 518. (3) There being no evidence that deceased either failed to stop, look or listen, it will be presumed that he did all these things. Buesching v. St. Louis Gas Light Co., 73 Mo. 219; Powers v. Transit Co., 202 Mo. 267; Riska v. Union Depot Co., 180 Mo. 169; Weller v. Railroad, 164 Mo. 180; Tetwiler v. Railroad, 242 Mo. 189. (4) Under the evidence in this case plaintiff was clearly entitled to recover under the humanitarian rule. The engineer saw Underwood in a position of peril unconscious of the approach of the train in time, by the exercise of ordinary care, to have saved his life either by sounding an alarm or by setting the brakes and either stopping the train or slackening its speed. Chamberlain v. Railroad, 133 Mo. 604; Morgan v. Railroad, 159 Mo. 262; Kellny v. Railroad, 101 Mo. 67; Klockenbrink v. Railroad, 172 Mo. 678; Fearsons v. Railroad, 180 Mo. 208; Scullin v. Railroad, 184 Mo. 705; Rey-

burn v. Railroad, 187 Mo. 565; Hinzeman v. Railroad, 182 Mo. 621, and 199 Mo. 56; Rapp v. Transit Co., 190 Mo. 162; Woods v. Railroad, 188 Mo. 229; Eppstein v. Railroad, 197 Mo. 720; Lynch v. Railroad, 208 Mo. 34; Ewert v. Railroad, 160 S. W. 36; Ellis v. Railroad, 234 Mo. 680; Lyons v. Railroad, 161 S. W. 726; Dutcher v. Railroad, 241 Mo. 160; Feldman v. Railroad, 158 S. W. 88. (5) Failure to give warning upon discovery of peril alone entitles one injured to recover, even though the train could not be stopped. Railroad v. Allen, 80 S. W. 240; Kroger v. Railroad, 69 S. W. 809. (6) Where the evidence is conflicting as to whether or not the engineer used ordinary care to prevent the injury presents a question for the jury. Railroad v. Baker, 130 Pac. 577. (7) The court committed no error in giving plaintiff's instructions A and B, which submitted the case to the jury on the two issues pleaded in the petition, namely, on the statutory negligence of the defendant, and on the common law negligence of the defendant, or what is generally known as the last chance doctrine. These two theories are perfectly consistent and were fully established by the evidence. Nivert v. Railroad, 232 Mo. 626; Clarke v. Railroad, 242 Mo. 570; Kreymeyer v. Transit Co., 220 Mo. 639.

STURGIS, J.—This suit originated in Lawrence county, Missouri, but was tried on change of venue in Jasper county. It was brought by the wife to recover for the death of her husband under section 5425, Revised Statutes 1909. The husband was killed at a public road crossing some four miles southeast of Aurora by colliding with defendant's passenger train while he was attempting to cross the defendant's track at that point about noon, July 1, 1913. He was at the time a rural route mail carrier traveling out of Aurora in an open, ordinary, steel tired, one horse buggy, with a large umbrella fixed to the seat and buggy bed for

a shade. The defendant's track as it approaches this crossing going from Aurora, the direction the train in question was going, runs somewhat south of east, curving to the south. The wagon road on which the deceased, Martin L. Underwood, was traveling runs directly east as it approaches this crossing going in the direction deceased was traveling. The train and the deceased were therefore both traveling in a generally eastward direction, the railroad and wagon road being somewhat parallel but gradually converging towards and meeting at this crossing. The wagon road is south of the railroad until it reaches this crossing and then passes on east and north. As the deceased was traveling much the slower, the train came from behind him and caught him as the hind wheels of his buggy were leaving the track. It should be said, however, that the wagon road curves northward on entering the right of way and the railroad curving southeastward causes the two to cross nearly at right angles. For convenience we will speak of the railroad as running east though it angles and curves towards the southeast. The east-bound train, which killed deceased, was running about one hour late and on a slightly down grade. It was using little steam, thereby lessening the noise of running. The deceased was also traveling down hill as he approached the crossing on a road more or less rocky at different places, thereby causing more or less noise by the steel tires of his buggy. A mild wind was blowing in a direction tending to carry the noise of the train away from the deceased. Back west of the crossing at the whistling post, eighty rods from the crossing, the wagon road was some one hundred and fifty yards south of the railroad and on considerably higher ground. It continues on higher ground until it commences to descend some two hundred and fifty feet from the crossing. Five hundred feet west of the crossing the two roads are about one hundred and eighty feet apart,

The negligence counted on in the petition is a failure to give the statutory signals of keeping the bell ringing or sounding the whistle at intervals beginning eighty rods west of the crossing so as to warn the deceased of the approach of the train to the crossing, where the two did arrive at the same instant. The petition also pleads a violation of the humanitarian rule in that the persons operating the train saw or with due care could have seen the deceased and his apparent peril after he came into the danger zone and could have with reasonable care, but negligently failed to so use the means at hand in giving alarms and checking the speed of the train as to avoid the collision. The defendant denies the allegations of negligence on its part and plead negligence of the deceased in going upon the crossing, a place of known danger, without taking reasonable precautions in stopping, looking and listening for the coming train. The plaintiff recovered judgment for $10,000, the full amount allowed by law, but voluntarily remitted $2500, and, thereby, defendant's appeal is to this court.

The conditions surrounding this crossing are extraordinary, making it a peculiarly dangerous one to persons approaching it from the west, as deceased was at this time, in case a train, as so happened on this occasion, should also be approaching from the west. For some distance west of the crossing, five hundred feet at least, the wagon road, though only one hundred and eighty feet distant from the railroad and gradually converging, is nowhere in sight of the same until right at the crossing. The wagon road is some twenty to twenty-five feet higher than the railroad until it starts to descend some two hundred and fifty feet west of the crossing. Going down this hill the wagon road is itself in a cut for a distance of one hundred and fifty to one hundred and seventy-five feet, the deepest place being about one hundred and twenty-five feet from the crossing where the cut is four or

five feet deep. As the wagon road enters on the railroad right of way it leaves this cut and there is a distance of twenty-five to forty feet nearer level and some ten to twelve feet of this, next to the track, is on a fill, the road there being narrow and ditches three to five feet deep at the sides. There is evidence that after the horse is within eight to ten feet of the track it would be difficult and dangerous to turn around. At a point about fifteen to twenty-five feet west of the crossing the wagon road veers from a due east and west course to the northeast and crosses the railroad at right angles; after crossing the railroad track the wagon road continues down the hill and veers to the southeast three or four hundred feet, then turns north across a valley. Defendant's track from near the whistling post west of the crossing is cut in the north side of the hill until it reaches the crossing, the hill being about twenty-five feet high and lying between the track and the wagon road running west of the crossing above described. This hill between the railroad track and the wagon road at the time of the accident was covered by a dense growth of trees and bushes with dense foliage and growth of weeds, such hill, trees, bushes and weeds beginning at a point six or seven hundred feet west of the crossing and continuing down to within a few feet of the crossing. On account of the hill and the obstructions thereon a person approaching the crossing in the wagon road from the direction in which plaintiff's husband came could not see a train coming from Aurora at any point until his eyes were within *ten or twelve feet* of the rail, at which time his horse would be going over the track and the train but a short distance therefrom. He could not easily hear a train running upon a track giving no signals because the sound made by the train was thrown away from him and across the valley by the hill between the track and the wagon road, and because of the fact that the wind at the time was blowing in a contrary direction. The

evidence also showed that the train made very little noise. The train approaches the crossing in a cut; the wall of the cut on the right-hand side of the train going east, the side of the wagon road, was higher than any of the parts of the engine and owing to the curve to the south obstructed the engineer's view of the *crossing itself* until he had approached to within a distance of four hundred and forty to four hundred and sixty feet of the crossing. The walls of the cut sloped backwards from the railroad; at the bottom of the cut it was eight feet from the rail. One witness testified that at a point twenty-five or thirty feet back from the crossing a person could see a train only three to four rails length, or one hundred to one hundred and thirty feet. Further back it could not be seen until right at the crossing. There is evidence of several witnesses that on other occasions they were along this road near the crossing and either could not hear at all, or with great difficulty heard, a train approaching the crossing as this one was.

The evidence tends to show that the engineer did not see the deceased until the engine was within one hundred feet of the crossing, at which point the deceased's horse emerged from behind the embankment right at the track; that the deceased on the buggy seat could not see the train until *he* was within ten feet of the track and his horse then at the rail, the buggy on this embankment and no chance to turn around; that he applied the whip when on the track and tried to cross ahead of the engine but failed, the engine striking the hind wheels of the buggy, hurling the deceased some hundred feet or more, killing him instantly.

The defendant demurred to the evidence and insists that, granting that defendant was remiss in giving the required signals on approaching the crossing, yet deceased was guilty of contributory negligence barring any recovery in that he did not stop and look and listen for a coming train before venturing onto

the track. In this connection it is shown that deceased was perfectly familiar with all the surroundings and the facts we have detailed, as he had passed along this road and over this crossing almost every day for several years. It must be taken that he knew the great difficulty of hearing an approaching train; that same could not be seen until he was on the narrow embankment and the horse on the first rail.

It is elementary law that a railroad track is itself a warning of danger and that no one has a right to heedlessly enter on such danger relying on the persons running an approaching train to give him warning of its approach without himself taking every reasonable precaution to inform himself as to such approaching train. This is merely saying that where both parties are negligent, no. liability arises. It is always a person's duty to look and listen when possible before entering on a railroad crossing. When stopping is essential to make looking and listening effectual, then stopping is necessary. [Wands v. Railroad, 106 Mo. App. 96, 99, 80 S. W. 18; Masterson v. Railroad, 58 Mo. App. 572, 575; Campbell v. Railroad, 175 Mo. 161, 183, 75 S. W. 86.] It is said in Hook v. Railroad, 162 Mo. 569, 584, 63 S. W. 360, that: "When one cannot see a known threatened danger, as a fast-moving train approaching a crossing, that is desired to be passed by the traveler, on account of some intervening obstruction cutting off his view, the demand of common prudence is more imperative than ever that he call into requisition some other sense or faculty that may aid him in the acquisition of the desired information. . . . Because of a want of a prescribed act to be performed, under all circumstances, by the traveler, approaching a railroad crossing, he is none the less bound to observe those standards of precaution which the law has declared applicable to the situation. If the standard is to look where sight is availing to give the needed information, then the traveler must look, and failing

to do so, this, as all courts have declared, is negligence. If the sense of sight is unavailing to give the needed information, on account of the situation and surroundings, then the law has fixed another standard by which the conduct of the traveler must be measured. He must exercise the sense of hearing; if need be, he must stop and listen to ascertain if a train is approaching the crossing sufficiently near to interfere with his passing over it in safety, and if he fails to exercise that precaution (when through the sense of hearing he might have ascertained the whereabouts of the train) and is injured, the law pronounces its condemnation on such conduct." In Kelly v. Railroad, 88 Mo. 534, 547, the law is stated thus: "We do not understand the law to be, nor do we so hold, that it is the duty of the traveler, where the highway crosses the railroad track, absolutely and always to stop, or to fasten his team and go forward on foot to a point where he can look up and down the track, but as applied and limited to the facts of this case at such crossing and at such hours when trains are passing and liable to pass at any time, as was well known to said Coleman, we think it does require of him, where he cannot see the track, to listen, and, if necessary for that purpose, on account of the noise made by his wagon, to stop and listen for the train before venturing blindly upon it. This does not, we think, exact or require any unreasonable or extraordinary prudence or precaution on the part of the traveler, but is only such prudence as a reasonable man would take for the protection of his own person and property under such circumstances. Such is, we think, the doctrine and rule declared by this court heretofore in a number of cases. [Purl v. Railroad, 72 Mo. 168; Henze v. Railroad Co., 71 Mo. 636; Harlan v. Railroad, 64 Mo. 480; Fletcher v. Railroad, 64 Mo. 484.]"

Applying the law thus declared to the facts of this case, how does it stand? There is abundant evi-

dence to show that a closely approaching train could not be seen by deceased going towards the crossing until he was in a place from which there was no escape. To look when he was where looking was effectual was but to see the descending stroke. This he knew and, therefore, must be required to use his hearing. To venture on the crossing merely because he could not see an approaching train would be negligence. He also knew the difficulty of hearing an approaching train and the reasons why such a train might not be heard, even if close enough to the crossing to threaten immediate danger. Under such circumstances the law demanded that he use his sense of hearing, which was shown to be good, in such manner and under such conditions as would reasonably make his hearing effective in discovering the coming train. If it was necessary to stop the horse to do this, then a failure to do so is negligence. If the court can say that it is certain that the noise of the buggy, by reason of passing over a rocky road or otherwise, so impaired his hearing that the stopping of same would have enabled him to hear the train, then a failure to stop is negligence. Mere stopping unless he could thereby hear the train was as likely to put him in danger as to avert it.

It is claimed that the evidence does not show positively that the deceased did not stop. But, granting that there is so small a possibility to the contrary that we should treat this fact as proven, we cannot say that there is a certainty that stopping would have aided his hearing. The buggy was light and there is no proof that in going in an ordinary walk or slow trot, the gaits proven, on a comparatively smooth dirt road the hearing of the driver was impaired. Having thus listened and hearing no bell or whistle, which he would have heard had they been sounded, we think he might rely thereon and proceed. The evidence is conflicting as to the rockiness of the road near the crossing and the increased noise therefrom, if any. The evi-

dence is such that it is for the jury to say whether a stopping would have made the listening more effectual so as to make a failure to do so negligence. The case is a close one, but we rule that deceased was not guilty of contributory negligence as a matter of law.

The evidence as to defendant's giving the statutory signals of whistling or ringing the bell beginning eighty rods from the crossing is conflicting. The plaintiff's evidence is negative, as, indeed, it must be in all such cases. She must prove a failure to give signals and this can only be done by showing by those having the ability to hear and being in a position and condition of mind to hear and take note of the hearing that they did not hear any signals given. The value of such evidence depended largely on the opportunity of the witness to have heard and the conditions of his mind causing him to take note of and remember the absence of any such signal. When the opportunities and circumstances are such as to give such negative evidence some probative force, its weight and credibility is for the jury. There is such evidence here.

Besides, it is significant that the positive evidence of some of defendant's witnesses as to the whistle being sounded. at the proper distance from the crossing discloses that only two weak blasts or "toots" were given right at the whistling post and no other signal by bell or whistle occurred until the shrill danger signals were given immediately before deceased was struck. The evidence shows a considerable interval of silence between the signals at the whistling post and those at the crossing. According to this evidence the train ran in silence so far as these signals are concerned along under the hill while the deceased was incapable of seeing the train, as will be presumed in the absence of evidence to the contrary, was listening for such signals and, lured into security by their absence, passed on to his death. The statute requires that not only such signals be given at the whistling post,

but that same be continued—continuously if by bell
"and at intervals" if by whistling—until the crossing
is passed.  It needs no argument to show that under
the peculiar facts of this case, while the first blast at
the distant whistling post might not have been heard
by deceased by reason of being then in the cut or by
the rattle of his buggy over a stony place or other
cause, yet, on the smoother road and under more fa-
vorable circumstances nearer the crossing such signals
would have been heard and would have given abund-
ant warning.  We rule that the court did not err in
submitting the case to the jury on this theory.

It is next urged that the court erred in submitting
the case to the jury on the humanitarian theory by
telling the jury that if deceased was killed on the cross-
ing, "then even though you may believe from the evi-
dence that Martin L. Underwood negligently drove up-
on the railroad track, yet if you further believe from
the evidence that the defendant's engineer operating
said train saw, or by the exercise of reasonable care
could have seen that the said Martin L. Underwood
was about to drive upon said railroad track, and was
in a dangerous situation, in time to have avoided in-
juring him by the use of ordinary care, and with safety
to himself, to the train and its passengers and persons
on board thereof, and that said engineer negligently
failed to do so, your verdict should be for the plain-
tiff."  The insistence is that there is no evidence on
which to base this instruction; that the evidence fails
to show that sufficient time was given after deceased's
peril was discovered requiring anything to be done
which was not done.  This necessitates a further exam-
ination into the facts bearing on this issue; and the
importance of the case and the lengthy record is our
justification for doing so.

The most important question to be determined in
this connection is the distance, and thereby the time,
intervening between the engine and the deceased or his

horse when same came within the range of the engineer's vision. We assume that the engineer saw the deceased practically as soon as was possible, and so he testified. We also assume that deceased was in great danger, apparent to the engineer, as soon as he was or could be seen. The train, according to the engineer, was going thirty-five to forty miles per hour, fifty-one to fifty-eight feet per second; other witnesses indicate faster. If we knew the distance we could calculate the time on this basis. If we knew the rate the horse was traveling it would aid much in this respect. Only two witnesses, one a girl of fifteen years of age and the other a woman, saw the horse and deceased as they approached the crossing. The girl was at a house at least six hundred feet east of the crossing, saw the collision and thought the horse was going in an ordinary walk. The woman, Mrs. Hemphill, was at her house three hundred feet west of the crossing, saw the deceased going down the hill, heard the coming train, saw the collision, and says the horse was going in a slow trot. Another witness said an ordinary walk is generally understood to be four miles per hour, six feet per second. This being all the evidence, we must so assume or rely on common experience. On that basis the train was traveling eight to ten times as fast as the horse.

The engineer testified: "A. Well, as I rounded the curve at this crossing I saw the horse's head and I began to blow what we call the 'stock whistle' just as fast as you can blow the whistle, and I blew that whistle until the engine had about got on the crossing. Q. Now, then, when you first saw this horse's head, how near the crossing were you? A. Well, running along on the road it looked to be about seventy-five to one hundred feet. Q. How much of that horse did you see at that time when you first observed the horse's head? A. Well, I could see his head and part of his neck I suppose. Q. Now, just go on in your own

way and tell the jury what took place from that time on. A. As soon as I saw this horse I began to blow the 'stock whistle,' as we call it, and kept coming towards the crossing. I saw then it was hitched to some vehicle—but before I go any further—I was running with my hand on the throttle. As soon as I saw the horse I shut the steam off, grabbed this whistle cord, and began to whistle, blow the whistle, and reached with my right hand and shoved the brakes on. I saw it was—the horse kept coming—it was hitched to a vehicle. When it got out about the middle of the track, the party had an umbrella shade over him, and he peeked out from under the shade and looked the direction we were coming from. He then looked like he was trying to slack the horse and changed his mind and began to whip him up. By that time we got by the crossing and he got out of my sight. I was going to release my brakes and the fireman says: 'We hit that man.' We stopped, backed up, and picked him up and loaded him on the train. Q. Now, in coming down to that crossing at what speed was your train running? A. Well, I had to judge it between thirty-five and forty miles per hour. Q. In coming down that grade from the whistling post, state whether you were working steam or were not working steam. A Was working. Was working a light throttle.''

It is insisted that the engine was further from the crossing than he supposed and testified. That is probable, as danger always looms up big and close. Thrilled with excitement, his eye and mind were not centered on measuring distance. His attention was drawn to other things as his evidence shows. Nor could we expect him to say with mathematical accuracy just how much of the horse was visible at the first glance.

But what basis is there for holding, as plaintiff insists, that the engine was then four hundred feet or more from the crossing—the furthest point at which the horse's head could be seen when right over the

south rail.  The horse's head when seen by the engineer could not have been more than eight to ten from the south rail.  In discussing the deceased's negligence in driving on the crossing in front of the moving train, plaintiff's learned counsel says: "The evidence, photographs and physical facts all show that when Mr. Underwood had passed the obstruction so that he could see the train his horse was going over the track and he himself was in a place of peril.  The obstruction (the wall of the cut) at the bottom began eight feet south or west of the rail, so that his eyes had to be within *ten* or *twelve feet* of the rail before he could see a train, at which time his horse would be going over the track."  Move the horse back ten feet and you have only his head visible.

As showing the possibilities of the engineer's seeing the horse in this position, plaintiff introduced three photographs taken with a camera over the right rail, the engineer's side, at different distances west from the crossing and looking in that direction, as was the engineer.  The first one is taken at a distance of one hundred and thirty-five feet, three seconds, from the crossing, with the horse's head ten feet, two seconds, from the south rail and showing about one-half of the horse and the top of the umbrella over the driver's head visible, but the buggy and driver invisible behind the embankment.  The next one, Exhibit "B," is taken from a point two hundred and eighty-five feet, five seconds, from the crossing, with the horse and buggy in the road and the horse's head five feet, one second, from the south rail.  This one is reproduced here:

Underwood v. Railroad.

The third one is taken three hundred and thirty feet, six seconds from the crossing, with the horse's head immediately above the south rail at the crossing and showing only the horse's head and neck visible. Why the horse was moved closer to the rail each time the camera was moved further from the crossing is left to conjecture.

Two witnesses testified that on placing a horse at the crossing five or six feet, one second, from the south rail, (one said his head, the other his front feet being at this distance) and walking up the track they could see his head and neck four hundred and six feet, eight seconds, from the crossing. Beyond that the curve and bank shut off the view of the horse.

This is plaintiff's evidence and shows the possibilities of seeing a horse's head protruding from behind the embankment viewed from points at different distances from the crossing, the horse being nearer the rail as the distance from the crossing grows longer. It also shows the narrow range of a few feet as the horse approached the crossing, the whole range being ten feet, on which the plaintiff builds her case. Certainly this evidence does not show where the engineer was when he could first see the horse's head coming towards the track. He could do that at any point where either photograph was taken or between those points, depending on the horse being a little further back from the rail but nowhere more than ten to twelve feet. At the latter point the engineer would be not over one hundred and fifty feet, three seconds, from the crossing. It clearly shows that the horse's head could not have been seen at a greater distance than four hundred feet, eight seconds, from the crossing, its head being then at the rail; and in that event three to four seconds would place the horse, buggy and all over the track in safety.

Plaintiff's whole argument is based on the assumption that the engine was actually at the furthest point

possible from the crossing at which the horse's head could be seen by the engineer before the horse passed over the south rail. But there is no basis for this presumption. There is no evidence showing at what point the engine was when the horse came in sight. The evidence shows mere possibilities. If, as appellant admits, the horse's head could not be seen further from the rail than ten feet when the engine is within two hundred to two hundred and fifty feet of the crossing, then four to five seconds, with the engine traveling fifty to fifty-five feet per second and the horse five to six feet per second, would cause them to meet as they did. This supposition has some evidence to rest on.

An argument is based on the statement of the fifteen-year-old girl, made, honestly no doubt, after she had insisted that she did not know but assenting on suggestion that she thought the train was half a quarter from the crossing when the horse 'and buggy were twenty-five feet therefrom. She said she was only guessing at these distances and any one knows how difficult it is to deliberately estimate a distance of twenty-five feet with objects standing still when viewed at a distance of six hundred feet. This same witness, with far better opportunity of judging, guessed that the Hemphill house was forty to fifty yards from the crossing, when it is admitted that the distance is one hundred yards. Her evidence is too uncertain and indefinite to furnish a substantial basis for liability based on so narrow a margin. [Rollison v. Railroad, 252 Mo. 525, 540, 160 S. W. 994; Osborn v. Railroad, 179 Mo. App. 245, 166 S. W. 1118, 1124.] The argument based thereon is likewise based on the supposition that the engine was traveling at least fifteen times as fast as the horse. The other witness on this point, Mrs. Hemphill, who was at her home three hundred feet from the crossing, says that when she heard the train about even with, "straight across from," her

house, the deceased was seventy to seventy-five feet from the crossing. [See McCreery v. United Rys. Co., 221 Mo. 18, 27, 120 S. W. 24.]

But why speculate as to one or two seconds in time and five to ten feet in the distance of the horse from the track? Liability can not be predicated on so narrow a margin. The burden is on the plaintiff to prove the facts which bring the case within the rule now invoked. Engineers are human beings and we cannot exact of them to act instantly and in the most intelligent way in cases of emergency. Liability does not arise from mere errors of judgment or failure to act instantly in such cases. Every one knows that the very necessity for instant action delays the same and emergencies demanding quick and intelligent action breed confusion and delay. An act which ordinarily would be performed in a second, if limited to that in order to save life often paralyzes the efforts to do so. The engineer's duties under such circumstances are complex, he must think and that takes time. The first glance only revealed a horse, later a buggy and man. He testified as to what he did and the order of doing same—shut off the steam, sounded the alarms several times, applied the air brakes. He does not state, and could hardly do so, the time it took to do each, but seconds flit by. He thinks the brakes were on by the time he reached the crossing but does not know whether the speed had been perceptibly checked or not. The train was stopped in a thousand to twelve hundred feet.

Much has been said recently on this question by our Supreme Court and by their decisions we are bound. In McGee v. Railroad, 214 Mo. 530, 543, 114 S. W. 33, the court said: "This train would run four hundred feet in five and one-half seconds. How are those mere pulse beats to be distributed between the engineer and fireman in meting out praise and blame and arriving at actionable negligence? Here are the

minds of two men that must grasp an acute crisis after an interchange of intelligence. Courts being eminently practical tribunals in getting at practical and just results in the affairs of men, will it do to chop logic and predicate actionable negligence on subtle reasoning involving metaphysical features and covering an interval of half a second or one or two seconds of time? We think not. Therefore to get to the jury plaintiffs must get their case out of the fog of conjecture and plant it on a basis of fact. This they failed to do on the issue now in hand. Hence the humanitarian doctrine is out of the case.'' In Degonia v. Railroad, 224 Mo. 564, 596, 123 S. W. 807, it is said: ''But, further, if the train was running twelve miles per hour as the evidence shows, it would cover 352 yards per minute or about six yards per second, so that there were but ten seconds in which to act. Yet defendant is held liable for not saving a life, with only ten seconds—ten ticks of the watch—in which to act.'' And, in Burge v. Railroad, 244 Mo. 76, 101, 148 S. W. 925, it is said: ''But we go further. If this train was running sixty miles an hour, then it made eighty-eight feet per second. Under the evidence it is clear that deceased could not have been seen, owing to the curve in the track, until the train was within 900 to 1000 feet of him. Taking the outside limit of 1000 feet, the engineer only had 11 4/11 seconds, from the time his engine rounded the curve, to discover the peril of the deceased, to sound his alarms, and to apply his brakes. Human beings can't work with the rapidity of electricity. Thoughts must be gathered and nimble fingers and hands put in motion. Seconds fleet by. They are unlike minutes. We say in this case as we did in the Degonia case, 224 Mo. l. c. 596: 'Yet defendant is held liable for not saving life, with only ten seconds—ten ticks of the watch—in which to act.' In the case at bar if the train was going as fast as some of plaintiff's witnesses put it there was less than ten seconds in which to act, and even if going

as slow as defendant's witness put it, there was but little more. We do not believe that the facts of this case authorize its submission to the jury even upon the humanitarian rule. The engineer says that he did all he could, and in this he is corroborated by plaintiff's witnesses who felt the jar of the train when the air-brakes were applied." In Rollison v. Railroad, 252 Mo. 525, 160 S. W. 994, 998, the court said: "If it be said we are dealing in refinements, the answer is: So must appellant's learned counsel deal in refinements to fasten liability on defendant, and, maybe, refinement against refinement (like estoppel against estoppel) 'setteth the matter at large.' To predicate negligence on two seconds of time is in and of itself a monumental refinement. We cannot adjudicate negligence on such pulse beats and hair-splitting, such airy nothings of surmise . . . for, as said, we are dealing with seconds in order to transfer $10,000 from the pocket of A. to the pocket of B.—a delicate function."

It was error to submit this case on the humanitarian doctrine. It was also error to modify the defendant's instructions on contributory negligence to meet that doctrine and thereby exempt plaintiff from its consequences. The case should be tried and instructions given unhampered by that doctrine.

It is also claimed that plaintiff's petition counts on and that she recovered $10,000, actual damages, while under the case of Boyd v. Railroad, 236 Mo. 54, 139 S. W. 561, the first $2000, is penalty and actual damages are thereby limited to not over $8000. The instruction on the measure of damages limits the same to actual damages and in a way eliminates the penalty feature of the statute but nevertheless fixes the minimum at $2000. In this case there was a remittitur below the $8000 amount. We have said about all we can on this subject in Johnson v. Railroad, 182 Mo. App. —, 163 S. W. 896, and it is useless to discuss it further.

It results that the case is reversed and remanded.

*Farrington, J.,* concurs. *Robertson, P. J.,* dissents and files separate opinion.

## DISSENTING OPINION.

ROBERTSON, P. J.—The conclusion reached by the majority as to the correctness of the trial court's ruling on defendant's demurrer to the evidence conforms to my views but I am unable to concur in the holding that the humanitarian doctrine was not involved in the trial of the case and I find nothing in any decision of the Supreme Court with which I am in conflict.

In the trial the defendant placed upon the witness stand the engineer who was in charge of the engine that struck the extreme rear of the left hind wheel of the buggy and who testified that as he "rounded the curve at the crossing" he saw the horse's head, sounded the "stock whistle," shut the steam off, shoved the brakes on, and observed the deceased, when about the middle of the track, peep out from under the umbrella on the buggy, slacken his speed and then "whip up." Under this testimony it appears to me that it is going to an extreme and unjustified extent to resort to mathematics and speculations to determine the relative positions of the train and the deceased at some certain time because the defendant, by eliciting this testimony, vouched for the possibility of the engineer accomplishing these acts after he observed the deceased in a place of danger and I cannot see that it affects the case in the least as to the exact place the deceased was when the engineer saw him or precisely how far from the crossing the train was at that time, as the defendant fixed the standard of its engineer's capacity within whatever distance it may have been and upon that theory sought a verdict, and now that it has failed the majority opinion holds that the engineer could not, as a matter of law, do what he testified as a matter of fact he did.

If he had done what he said he did, and the defendant should not now be heard to say he could not, the testimony tends to prove strongly, if not conclusively, by the engineer's own testimony, that the speed of the train would have been so slackened that the deceased, who was, as found by the jury, in a perilous position by reason of defendant's negligence, would have had several "ticks of the watch" in which to have passed out of danger. The fact that the jury may not have believed the engineer's testimony, as to applying the brakes, etc., is no argument against the proposition that we must not ignore the standard of ability possessed by engineers, as advanced by the defendant, trained to act in emergencies, and repudiate the multitude of cases holding that a party shall be held to his theories and not be permitted to seek advantages therefrom and abandon them at will and when defeat is imminent. Assuming that the defendant should not be measured by the standard of what its engineer did in this particular case, but by what an ordinarily prudent engineer could have done under the same or similar circumstances, yet by this testimony the defendant made an issue of fact for the jury and not a question of law for the court.

I think the judgment should be affirmed.